## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WENDUO GUO, Derivatively on Behalf of Nominal Defendant COINBASE GLOBAL, INC., | )<br>)<br>) |
| | ) Case No. 2:25-cv-01309 |
| Plaintiff, | ) |
| | ) **JURY TRIAL DEMANDED** |
| v. | ) |
| | ) |
| BRIAN ARMSTRONG, FREDERICK ERNEST EHRSAM, III, FRED WILSON, MARK L. ANDREESSEN, KELLY A. KRAMER, GOKUL RAJARAM, TOBIAS LÜTKE, KATHRYN HAUN, ALESIA J. HAAS, EMILIE CHOI, PAUL GREWAL, and JENNIFER N. JONES, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| COINBASE GLOBAL, INC. | ) |
| | ) |
| Nominal Defendant. | ) |
| | )<br>) |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Wenduo Guo ("Plaintiff"), by and through his undersigned attorneys, brings this verified stockholder derivative action on behalf of nominal defendant Coinbase Global, Inc. ("Coinbase" or the "Company"), against certain of the Company's executive officers and its board of directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*, the investigation conducted by his counsel, including review of publicly available information regarding the Company; the allegations of a class action

complaint filed in the Securities Class Action captioned *In re Coinbase Global, Inc. Securities Litigation,* Case No. 2:22-cv-04915-BRM-LDW (D.N.J. Aug. 04, 2022); (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Coinbase; legal filings; news reports; and securities analysts' reports about the Company.

## NATURE OF THE ACTION

1.    This shareholder derivative action is brought on behalf of Coinbase against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least April 14, 2021 and June 5, 2023, inclusive (the "Relevant Period"), and for violations of the federal securities laws caused by the issuance of materially false and misleading statements issued, or caused to be issued, by the Individual Defendants in the Company's SEC filings and other public statements. The Individual Defendants' wrongdoing has exposed the Company to massive potential liability to the class, as well as the significant defense costs in the Securities Class Action, as set forth below.

2.    Coinbase operates a cryptocurrency exchange platform that allows users to buy, sell, and store hundreds of different of cryptocurrencies. The Company's primary customers are retail customers, or individuals, though the Company's customers also include institutions like hedge funds, financial institutions, and corporations.

3.    Users seeking to invest in cryptocurrencies on the Company's platform must first create a Coinbase.com account. In creating such an account, users are prompted to read and sign the Coinbase User Agreement (the "Retail User Agreement"). Another requirement for users seeking to transact on the Company's platform is to maintain a digital "wallet" to store cryptocurrencies on the exchange.

4.      Users can opt to maintain a digital wallet hosted by the Company (a "hosted wallet"), whereby Coinbase acts as a digital asset custodian. The Retail User Agreement assures these users that assets in their hosted wallet "are custodial assets held by Coinbase for your benefit." Alternatively, users can use the Company's Coinbase Wallet product, which is a free software installed on the user's internet browser or mobile device, allowing the user to store "[t]he private keys (that represent ownership of the crypto) . . . directly on your device and not within a centralized exchange like Coinbase.com."

5.      On April 14, 2021, Coinbase went public via a direct listing (the "Direct Listing").

6.      In the years preceding the Direct Listing, investors and market analysts understood that the risk of digital asset loss was a significant problem for cryptocurrency exchanges. In fact, due to major insolvency risks and the inadequate regulatory frameworks governing such exchanges, cryptocurrency investing was characterized as an "online Wild West where sheriffs are largely absent" by Reuters. Indeed, prior to the Direct Listing, at least 75 cryptocurrency exchanges collapsed, leaving customers unable to recover their digital assets.

7.      Despite repeated statements by Company management to the contrary, Coinbase was no different with respect to the risk of digital asset loss in the event of bankruptcy. If Coinbase were to declare bankruptcy, the cryptocurrency assets held in custody by Coinbase could be considered the property of the Company's bankruptcy estate, with Coinbase's retail customers being treated as general unsecured creditors.

8.      In addition to the undisclosed risk related to digital asset loss in the event of bankruptcy, Company management further failed to disclose that Coinbase engaged in proprietary trading, a risky practice involving trading assets using the Company's money. While Company management consistently represented throughout the Relevant Period that "[w]e do not engage in

proprietary trading on our platform," Coinbase had been engaged in proprietary trading since at least 2021 to compensate for declining prices of cryptocurrencies, which exposed the Company to heightened risks of financial loss, reputational damage, and regulatory scrutiny. As The Wall Street Journal would ultimately reveal, the highest levels of Company management were involved in the creation of business unit designed to engage in such trading, and "[e]mployees were discouraged from sharing information about the new trading business or discussing it in internal communications."

9.    Additionally, throughout the Relevant Period, Company management failed to disclose that Coinbase listed unregistered securities in violation of the federal securities laws. Indeed, Company management repeatedly represented that "Coinbase's rigorous review process keeps securities off Coinbase's platform."

10.    On June 6, 2023, the SEC filed a complaint against Coinbase (the "SEC Complaint"), alleging that the Company had violated the federal securities laws by listing unregistered securities and by failing to register "with the SEC as a broker, national securities exchange, or clearing agency, thus evading the disclosure regime that Congress has established for our securities markets." The SEC Complaint charged Company management with "elevat[ing] its interest in increasing its profits over investors' interests, and over compliance with the law and the regulatory framework that governs the securities markets and was created to protect investors and the U.S. capital markets."

11.    As the truth gradually emerged, revealing to the public that customer assets were at risk in the event of bankruptcy, the Company engaged in proprietary trading, and the Company listed unregistered securities, the price of Coinbase stock declined precipitously, harming shareholders and the Company.

12.     As a direct and proximate result of the misconduct detailed herein, Coinbase has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, costs and penalties associated with the SEC's enforcement action related to unregistered securities on the Company's platform, losses in market capitalization, reputational harm, and the loss of goodwill.

13.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a)) and Rule 14a-9 (17 C.F.R.§240.14a-9).

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18.     Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391(b)(1), as a substantial portion of the acts and omissions alleged herein, including the issuance and dissemination of materially false and misleading information, occurred in this District.

**PARTIES**

*Plaintiff*

19.     Plaintiff is, and has been at all relevant times, a shareholder of Coinbase.

*Nominal Defendant*

20.     Nominal Defendant Coinbase is incorporated under the laws of the State of Delaware.

21.     The Company describes itself as a "remote-first company" and accordingly does not maintain a principal executive office. Coinbase's common stock trades on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "COIN."

*Individual Defendants*

22.     Defendant Brian Armstrong ("Armstrong") co-founded the Company and has served as Coinbase's Chief Executive Officer ("CEO") and the Chairman of the Board since May 2012. Defendant Armstrong is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Armstrong received $7,465,350 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Armstrong beneficially owned 5,914,380 shares of Coinbase Class A common stock and 28,933,818 shares of Coinbase Class B common

stock, collectively worth roughly $8.8 billion[1] and granting Defendant Armstrong 52% of the total voting power in the Company. During the Relevant Period, Defendant Armstrong sold 1,300,029 shares of Company stock while in possession of material non-public information for proceeds of more than $323 million, including the sale of 749,999 shares of Company stock in just two days following the Direct Listing. The trades executed in the two days following the Direct Listing were open-market trades and were not made pursuant to a 10b5-1 plan.

23.    Defendant Frederick Ernest Ehrsam III ("Ehrsam") co-founded the Company along with Defendant Armstrong and has served as a member of the Board since March 2013. Defendant Ehrsam is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Ehrsam received $319,953 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Ehrsam beneficially owned 4,662 shares of Coinbase Class A common stock and 16,971,816 shares of Coinbase Class B common stock, collectively worth roughly $4.3 billion and granting Defendant Ehrsam 30.4% of the total voting power in the Company. During the Relevant Period, Defendant Ehrsam sold 1,500,139 shares of Company stock while in possession of material non-public information for proceeds of more than $492 million, including the sale of 298,789 shares of Company stock in just two days following the Direct Listing. The trades executed in the two days following the Direct Listing were open-market trades and were not made pursuant to a 10b5-1 plan.

24.    Defendant Fred Wilson ("Wilson") has served as a member of the Board since

---

[1] Valuations of the Individual Defendants' personal holdings of Coinbase Class A common stock are calculated based on the $252.11 per share closing price of Coinbase common stock on April 1, 2024, the next trading day after March 31, 2024. Further, the valuations assume that the fair market value of Coinbase Class B common stock, which is not listed on any securities exchange, is equal to the fair market value of Coinbase Class A common stock, as each share of Class B common stock is convertible into one share of Class A common stock at any time at the option of the holder.

January 2017 and serves as a member of the Audit and Compliance Committee (the "Audit Committee"). Defendant Wilson is named as a defendant in the Securities Class Action. As of March 31, 2024, Defendant Wilson beneficially owned 422,928 shares of Coinbase class A common stock, worth roughly $106.6 million. In the two days following the Direct Listing, Defendant Wilson reaped more than $1.8 billion in proceeds, selling personal shares of Company stock while in possession of material non-public information. These were open-market trades and were not made pursuant to a 10b5-1 plan.

25.     Defendant Mark L. Andreessen ("Andreessen") has served as a member of the Board since December 2020. Defendant Andreessen is named as a defendant in the Securities Class Action. As of March 31, 2024, Defendant Andreessen beneficially owned 1,150,028 shares of Coinbase Class A common stock, worth roughly $289.9 million. During the Relevant Period, Defendant Andreessen sold 1,057,984 shares of Company stock while in possession of material non-public information for proceeds of more than $311 million, including the sale of 314,024 shares of Company stock in just two days following the Direct Listing. The trades executed in the two days following the Direct Listing were open-market trades and were not made pursuant to a 10b5-1 plan.

26.     Defendant Kelly A. Kramer ("Kramer") has served as a member of the Board since December 2020 and serves as Chair of the Audit Committee. Defendant Kramer is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Kramer received $349,914 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Kramer beneficially owned 25,824 shares of Coinbase Class A common stock, worth roughly $6.5 million.

27.     Defendant Gokul Rajaram ("Rajaram") has served as a member of the Board since

August 2020. Defendant Rajaram is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Rajaram received $329,942 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Rajaram beneficially owned 4,833 shares of Coinbase Class A common stock, worth roughly $1.2 million.

28.    Defendant Tobias Lütke ("Lütke") has served as a member of the Board since February 2022. According to the Company's public filings, Defendant Lütke received 684,945 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Lütke beneficially owned 214,968 shares of Class A common stock, worth roughly $54.2 million.

*Former Director Defendant*

29.    Defendant Kathryn Haun ("Haun") served as a member of the Board from May 2017 until June 2024. Defendant Haun is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Haun received $339,924 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Haun beneficially owned 140,570 shares of Coinbase Class A common stock, worth roughly $35.4 million. During the Relevant Period, Defendant Haun sold 183,835 shares of Company stock while in possession of material non-public information for proceeds of more than $61 million, including the sale of 150,000 shares of Company stock in just two days following the Direct Listing. The trades executed in the two days following the Direct Listing were open-market trades and were not made pursuant to a 10b5-1 plan.

*Officer Defendants*

30.    Defendant Alesia J. Haas ("Haas") has served as Coinbase's Chief Financial Officer ("CFO") since 2018. Defendant Haas is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Haas received $11,967,321 in 2022

in compensation from the Company. As of March 31, 2024, Defendant Haas beneficially owned 370,931 shares of Coinbase Class A common stock and 617,668 shares of Coinbase Class B common stock, collectively worth roughly $249.2 million and granting Defendant Haas 1.1% of the total voting power in the Company. During the Relevant Period, Defendant Haas sold 646,108 shares of Company stock while in possession of material non-public information for proceeds of more than $115 million, including the sale of 255,500 shares of Company stock in just two days following the Direct Listing. The trades executed in the two days following the Direct Listing were open-market trades and were not made pursuant to a 10b5-1 plan.

31.    Defendant Emilie Choi ("Choi") has served as Coinbase's Chief Operating Officer since June 2019 and as its President since November 2020. Defendant Choi is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Choi received $23,499,963 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Choi beneficially owned 1,800,580 shares of Coinbase Class A common stock and 110,000 shares of Coinbase Class B common stock, collectively worth roughly $481.7 million. During the Relevant Period, Defendant Choi sold 649,888 shares of Company stock while in possession of material non-public information for proceeds of more than $429 million, including the sale of 614,170 shares of Company stock in just two days following the Direct Listing. The trades executed in the two days following the Direct Listing were open-market trades and were not made pursuant to a 10b5-1 plan.

32.    Defendant Paul Grewal ("Grewal") has served as Coinbase's Chief Legal Officer and Secretary since August 2020. Defendant Grewal is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Grewal received $7,473,148 in 2022 in compensation from the Company. As of March 31, 2024, Defendant Grewal beneficially

owned 692,698 shares of Coinbase Class A common stock, worth roughly $174.6 million. During the Relevant Period, Defendant Grewal sold 252,688 shares of Company stock while in possession of material non-public information for proceeds of more than $65 million.

33.      Defendant Jennifer N. Jones ("Jones") has served as Coinbase's Chief Accounting Officer at all relevant times. Defendant Jones is named as a defendant in the Securities Class Action. During the Relevant Period, Defendant Jones sold 150,911 shares of Company stock while in possession of material non-public information for proceeds of more than $51 million, including the sale of 110,000 shares of Company stock in just two days following the Direct Listing. The trades executed in the two days following the Direct Listing were open-market trades and were not made pursuant to a 10b5-1 plan.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

34.      Because of their positions as officers and/or directors of Coinbase, and their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Coinbase and its shareholders fiduciary obligations of good faith, loyalty, trust, and candor and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner at all relevant times.

35.      Therefore, the Individual Defendants were required to act in furtherance of the best interests of Coinbase and its shareholders.

36.      Each director and officer of the Company owes to Coinbase and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Coinbase, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of trust, loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Coinbase, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, earnings, internal controls, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding, *inter alia*: (i) the risk of customer asset loss in the event of bankruptcy; (ii) the Company's proprietary trading practices; (iii) unregistered securities on the Company's platform; and (iv) the adequacy of the Company's internal controls and its risk management function, and the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market

price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

40.    To discharge their duties, the officers and directors of Coinbase were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Coinbase were required to, among other things:

(a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Coinbase's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion;

(d)    Remain informed as to how Coinbase conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Coinbase and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)    Maintain and implement an adequate and functioning system of internal

legal, financial, and management controls, such that Coinbase's operations would comply with all applicable laws and Coinbase's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(g)     Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(h)     Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)     When put on notice of problems with the Company's business practices, operations, or internal controls, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

41.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Coinbase.

42.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Coinbase and were at all times acting within the course and scope of such agency.

43.     Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

46.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

47.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Coinbase, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

49.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Coinbase and at all times acted within the course and scope of such agency.

## COINBASE'S CODE OF CONDUCT

50.     Coinbase's Code of Conduct begins with a commitment "to the highest standards of legal, honest and ethical business conduct."

51.     The Code of Conduct applies to "all officers, employees, consultants, agents, representatives, independent contractors of the Company and members of our Board of Directors," and violations of the Code of Conduct "may result in disciplinary action, including dismissal."

52.     With respect to conflicts of interest, the Code of Conduct states the following:

All Company Members must avoid situations in which their personal interests may conflict, or appear to conflict, with the interests of the Company. It is not possible to list every situation that might give rise to a conflict of interest, but the information that follows serves as a guide, highlighting important areas where conflicts may arise. The responsibility for conduct within the letter and the spirit of this Code regarding conflicts of interest rests with each Company Member. It is important to avoid not only any situation that is an obvious conflict of interest, but also to be aware of situations that might appear to be a conflict.

53.     With respect to financial reporting and other public disclosures, the Code of Conduct states the following:

Company Members are expected to act responsibly and exercise sound judgment with respect to the Company's finances and financial reporting. Investors rely on accurate and fair financial and business information to understand our financial results and make informed decisions. Company Members may execute financial transactions only with authorization and in compliance with the Company's policies. Company Members also are expected to record and report all financial transactions and business information honestly and accurately, to comply with the Company's system of internal controls and to follow applicable laws, regulations and accounting practices

The Company regularly files reports and other documents with regulatory authorities, including the SEC. In addition, the Company may make other public communications, such as press releases, from time to time.

Depending upon the Company Member's position with the Company, the Company Member may be called upon to provide information to help ensure that the Company's public reports and communications are complete, fair, accurate and understandable. Company Members are expected to use all reasonable efforts to provide complete, accurate, objective, relevant, timely, and understandable answers to inquiries related to the Company's public disclosures. Company Members involved in preparing public reports and communications must use all reasonable efforts to comply with the Company's disclosure controls and procedures.

If any Company Member believes that any disclosure is materially misleading or becomes aware of any material information that such Company Member believes should be disclosed to the public, it is the Company Member's responsibility to bring this information to the attention of the CLO. If the Company Member believes that questionable accounting or auditing conduct or practices have occurred or are occurring, the Company Member should follow the procedures set forth in the Global Whistleblower Protection Policy.

54.     The Code of Conduct further states the following regarding SEC reporting requirements:

The Company's periodic reports and other documents led with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws. Any Company Member that contributes in any way to the preparation or verification of the Company's financial statements and other financial information, must ensure that our books, records, and accounts are accurately maintained. Such Company Members must also cooperate fully with the Company's finance department, as well as the Company's independent public accountants and counsel. Any Company Member that is involved in the preparation of the Company's SEC reports or financial statements, must:

- Be familiar with and comply with the Company's disclosure controls and procedures and the Company's internal control over financial reporting.

- Take all necessary steps to ensure that all lings with the SEC and all other public communications about the Company's financial and business condition provide full, fair, accurate, timely, and understandable disclosure.

55.     With respect to legal compliance, the Code of Conduct states that "[t]he Company will comply with all U.S. and international laws and governmental regulations that are applicable to its activities and expects all Company Members to obey the law."

56.    With respect to insider trading, the Code of Conduct states the following, in pertinent part:

> The Board has adopted an Insider Trading Policy to promote compliance with insider trading laws. Insider trading happens when someone who is in possession of material nonpublic information ("**MNPI**") trades securities on the basis of that information or discloses MNPI to someone else who trades on the basis of that information. Trading of digital assets is separately governed by the Global Digital Asset Trading Policy. Company Members considering trading Company stock (COIN) or other securities, should keep these three key points in mind:
>
> - Never buy or sell our securities when you have MNPI;
>
> - Keep all MNPI confidential, including from your family and friends; and
>
> - When in doubt about whether you have MNPI, ask before trading.

57.    With respect to risk assessment, the Code of Conduct states the following, in pertinent part:

> We aim to foster a culture of strong risk awareness and ownership, where all Company Members act as risk managers. Each one of us has a role to play in building a stronger, more resilient and sustainable company. As part of this role, we are all responsible for intelligent risk-taking, which means taking a holistic view of the risk and rewards of each decision.

## COINBASE'S CORPORATE GOVERNANCE POLICY

58.    Coinbase maintains a Corporate Governance Policy, which begins with a commitment "to sound corporate governance practices and to encourage effective policy and decision making at both the Board and management level, with a view to enhancing long-term value for our stockholders."

59.    In a section titled "Role of Our Board," the Corporate Governance Policy states the following, in pertinent part:

> Our stockholders elect our Board, which is our ultimate decision-making body (except as to matters reserved to, or shared with, our stockholders). It is the principal duty of the Board to exercise its powers in accordance with its fiduciary

duties to the Company and its stockholders and in a manner it reasonably believes to be in the best interests of the Company and its stockholders. In doing so, our Board oversees our business affairs and provides guidance and oversight to our Chief Executive Officer ("CEO") and other senior management to determine our long-term strategy and mission. In fulfilling its responsibilities, our Board is involved in strategic, financial and operational planning, financial and other public reporting, governance, compliance and risk management.

60.    With respect to conflicts of interest, the Corporate Governance Policy states the following:

Our Board expects that our directors will act ethically at all times and will adhere to the requirements of our Code of Business Conduct and Ethics and Related Party Transactions Policy. Directors are expected to avoid any action, position or interest that conflicts, or even appears to conflict, with the Company's interests. If an actual or potential conflict of interest arises for a director, the director will report the conflict in accordance with the procedures provided in our Code of Business Conduct and Ethics and Related Party Transactions Policy.

## COINBASE'S AUDIT COMMITTEE CHARTER

61.    Coinbase's Audit Committee Charter states that the purpose of the Audit Committee is to assist the Board in its oversight responsibilities related to:

- The Company's accounting and financial reporting processes and internal controls, including audits and the integrity of the Company's financial statements;

- The qualifications independence and performance of the Company's independent auditors (the "Independent Auditors");

- The design, implementation and performance of the Company's internal audit function;

- Risk assessment and management; and

- Compliance by the Company with legal and regulatory requirements.

62.    With respect to the Company's financial disclosures, the Audit Committee Charter states that the Audit Committee shall, "[p]rior to distribution to the public, review and discuss with management and the Independent Auditors, the Company's quarterly and annual financial results,

earnings press releases and earnings guidance provided to analysts and rating agencies, and other

public announcements regarding the Company's operating results."

63.    With respect to the Company's internal controls, the Audit Committee Charter

states that the Audit Committee shall:

> Review and discuss with the Company's management, its internal auditors (if any), and the Independent Auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of the Company's accounting and financial processes and systems of internal controls and material changes in such controls, including any control deficiencies, significant deficiencies and material weaknesses in their design or operation.

64.    With respect to the Company's internal audit function, the Audit Committee

Charter states the following:

> The Committee will oversee the design, implementation and performance of the Company's internal audit function, including:
>
> - Reviewing and participating in the selection of individuals to, and any changes in, the Company's senior internal audit position.
>
> - Overseeing the internal audit function, including its objectives, responsibilities, independence, performance, annual plan and budget, and staffing.
>
> - Periodically meeting separately with management and with internal auditors (or other personnel responsible for the internal audit function).

65.    With respect to the Company's risk oversight function, the Audit Committee

Charter tasks the Audit Committee with the following responsibilities:

> - Review with management the Company's major financial risks and enterprise exposures and the steps management has taken to monitor or mitigate such risks and exposures, including the Company's procedures and any related policies with respect to risk assessment and risk management.
>
>                              * * *
>
> - Review with management the Company's risk exposures in other areas, including credit, operational, technology, legal and compliance risk and

any related policies, as the Committee deems necessary or appropriate from time to time.

- Receive, as and when appropriate, reports and recommendations from management on risk tolerance, oversee the Company's process and policies for determining risk tolerance and review management's measurement and comparison of overall risk tolerance to established levels.

- Review or discuss any comments or recommendations of outside counsel or outside experts with regard to risk and compliance, and, if appropriate, make recommendations to the Board regarding a schedule for implementing any recommended changes and monitor compliance with any such Board-approved schedule.

- Review with management the Company's (a) programs for promoting and monitoring compliance with applicable legal and regulatory requirements, and (b) major legal and regulatory compliance risk exposures and the steps management has taken to monitor or mitigate such exposures.

- Review the status of any significant legal and regulatory matters and any material reports or inquiries received from regulators or government agencies that reasonably could be expected to have a significant impact on the Company's financial statements.

## SUBSTANTIVE ALLEGATIONS

*Background*

66.    Cryptocurrencies are digital assets whose ownership and sales history are recorded and reflected in a blockchain. A blockchain is essentially a digital database that can publicly record and store transactions. Blockchains distribute information among nodes of a computer network to create a secure and decentralized record of transactions.

67.    Coinbase operates a cryptocurrency exchange platform that allows users to buy, sell, and store hundreds of different of cryptocurrencies. The Company's primary customers are retail customers, or individuals, though the Company's customers also include institutions like hedge funds, financial institutions, and corporations.

68.    To attract and retain these customers, the Company has characterized itself throughout the Relevant Period as a platform offering "safe, trusted, easy-to-use technology and financial infrastructure products and services that enable any person or business with an internet connection to discover, transact, and engage with crypto assets and decentralized applications."

69.    With respect to the Company's primary revenue-generating activities, Defendant Haas stated the following during the Barclays Payments Forum:

> We operate a crypto custodian, an exchange, a broker, and we're building additional tools and products to help businesses grow their own crypto businesses. ***The majority of our revenue today is generated through trading fees***. When buyers come to our platform and investors come to our platform[,] [they come] to buy and sell the vast majority of crypto assets that we host on our platform.

70.    Indeed, in 2020 for instance, transaction fee revenue accounted for $1.10 billion of the Company's $1.14 billion in total revenues. Of the $1.10 billion in transaction fee revenue, net retail transaction fee revenue accounted for $1.04 billion. Accordingly, the Company's ability to attract and maintain retail customers has been critical to its financial success.

71.    Users seeking to invest in cryptocurrencies on the Company's platform must first create a Coinbase.com account. In creating such an account, users are prompted to read and sign the Retail User Agreement. Another requirement for users seeking to transact on the Company's platform is to maintain a digital wallet to store cryptocurrencies on the exchange.

72.    Each digital wallet has a corresponding private key and public key, which are randomized strings of alphanumeric characters. Private keys are essentially passwords, and they allow users to access the assets in their digital wallets. Public keys are used to verify blockchain transactions, and they enable others to send cryptocurrency to a user's digital wallet.

73.    Users can opt to maintain a hosted wallet, whereby Coinbase acts as a digital asset custodian. The Retail User Agreement assures these users that assets in their hosted wallet "are

custodial assets held by Coinbase for your benefit." Alternatively, users can use the Company's Coinbase Wallet product, which is a free software installed on the user's internet browser or mobile device, allowing the user to store "[t]he private keys (that represent ownership of the crypto) . . . directly on your device and not within a centralized exchange like Coinbase.com."

74.     Coinbase encouraged retail users to utilize the hosted wallet, warning that users of Coinbase Wallet were "responsible for maintaining the private keys." The Company further cautioned that "if you lose your private keys, Coinbase Wallet cannot help recover your account." Additionally, the functionality of Coinbase Wallet was limited, as users were required to transfer their digital assets from Coinbase Wallet to a Coinbase.com account before selling them on the Company's platform.

***Coinbase Goes Public***

75.     On January, 28, 2021, the Company announced that it planned to go public via a direct listing. While a traditional IPO involves the issuance of new shares, a direct listing involves the sale of pre-existing stock by the company's insiders or shareholders to the public.

76.     Moreover, IPOs typically involve a lock-up period, which restricts insiders from selling personal holdings in the company for a certain period of time (typically 180 days). In the case of a direct listing, a company's board of directors can opt not to enforce a lock-up period on the corporations insiders. The Individual Defendants elected not to enforce such a restriction on Coinbase's corporate insiders in connection with the direct listing.

77.     On February 25, 2021, the Company filed a registration statement on Form S-1 with the SEC in connection with its initial listing of common stock on the NASDAQ (the "Registration Statement").

78.     Investors understood the Direct Listing as an opportunity to invest in the booming

cryptocurrency market without directly owning the underlying crypto assets. For instance, a March 4, 2021 article published by The Hustle explained that the direct listing "**Brings in new mainstream investors**: Without needing to buy the underlying assets (e.g., Bitcoin, Ether), Coinbase will allow more Wall Street and retail investors to add crypto to their portfolios." (Emphasis in original).

79.     After amendments, the Registration Statement was declared effective by the SEC on April 1, 2021. On April 14, 2021, the Company filed a Prospectus on Form 424B4 with the SEC, in connection with the Direct Listing, which incorporated and formed part of the Registration Statement (the "Prospectus"). The Registration Statement also incorporated each "free writing prospectus" the Company had filed with the SEC leading up to the Direct Listing, including the prospectus filed on March 24, 2021 (the "Free Writing Prospectus," and together with the Registration Statement and the Prospectus, the "Offering Documents").

80.     On April 14, 2021, Coinbase commenced its Direct Listing, and its common stock began trading on the NASDAQ under the ticker symbol "COIN."

81.     Despite an initial reference price of $250 per share, the stock opened at $381 per share and quickly reached prices as high as $429.54 per share

82.     In just the first two days following the Direct Listing, the Individual Defendants collectively reaped billions of dollars in illicit profits, offloading their personal holdings of Company stock.

83.     At the time of the Direct Listing, Defendant Armstrong was the Company's largest individual shareholder, owning nearly 40 million shares of Coinbase stock, constituting approximately 21% of the Company's outstanding shares. Further, in August 2020, the Company's Board approved a compensation package, providing Defendant Armstrong the opportunity to reap

billions of dollars through stock option grants if certain performance-based conditions were met. First, Coinbase had to have a registration statement declared effective by the SEC. Second, Coinbase had to maintain a certain stock price for 60 consecutive trading days after the Direct Listing. Accordingly, Defendant Armstrong was highly incentivized to take the Company public and to issue the materially false and misleading statements detailed herein, in order to maintain the artificially inflated price of Coinbase's stock.

***Customers' Digital Assets Were Exposed to Loss in the Event Coinbase Went Bankrupt***

84.     In the years preceding the Direct Listing, investors and market analysts understood that the risk of digital asset loss was a significant problem for cryptocurrency exchanges. In fact, due to major insolvency risks and the inadequate regulatory frameworks governing such exchanges, cryptocurrency investing was characterized as an "online Wild West where sheriffs are largely absent" by Reuters. Indeed, prior to the Direct Listing, at least 75 cryptocurrency exchanges collapsed, leaving customers unable to recover their digital assets.

85.     Despite the Individual Defendants' repeated assurances to the contrary, Coinbase was no different with respect to the risk of digital asset loss in the event of bankruptcy. If Coinbase were to declare bankruptcy, the cryptocurrency assets held in custody by Coinbase could be considered the property of the Company's bankruptcy estate, with Coinbase's retail customers being treated as general unsecured creditors.

86.     While a banks and registered securities broker-dealers offer unsecured creditors certain protections, cryptocurrency exchanges like Coinbase would be liquidated under the U.S. Bankruptcy Code in the event of bankruptcy. Further, digital asset exchanges are not insured by any governmental or other agency, like the Federal Deposit Insurance Corporation ("FDIC") or the Securities Investor Protection Corporation ("SIPC").

87.    As explained by Professor Adam J. Levitin ("Professor Levitin"), Anne Fleming Research Professor of Law at the Georgetown University Law Center in a Texas Law Review article titled "Not Your Keys, Not Your Coins," "[c]ryptocurrency investors are unlikely to understand their legal treatment in the event of an exchange bankruptcy" as "the technical workings of bankruptcy law are not well understood by most laypersons or even attorneys (it is not a bar exam topic, for example)." Accordingly, it was crucial for the Individual Defendants to disclose these risks to unknowing investors. However, as discussed above, the Individual Defendants were highly incentivized not to disclose these risks because if they had done so, the Company's customers would likely find "custodial services more risky and less attractive," causing a "discontinuation or reduction in use of [the Company's] platform and products by existing customers," as Coinbase would ultimately acknowledge on May 10, 2022.

88.    The Individual Defendants demonstrated that they were aware of the undisclosed material risk to the Company's customers, and in turn, its shareholders, in the event of bankruptcy. For instance, in a June 11, 2019 letter submitted to the SEC (the "2019 Comment Letter"), Sam McIngvale, CEO of Coinbase Custody, a subsidiary of Coinbase, represented that "Coinbase Custody wallet addresses are completely segregated per client" and that "[a]ll client digital assets are held in trust for the benefit of clients and are segregated from both (i) the proprietary property of Coinbase Custody and its affiliates, and (ii) the assets of any other Coinbase Custody client." Accordingly, the Company understood the potential consequences of commingling customer assets in the event of a bankruptcy.

89.    Further, Coinbase took steps to mitigate the risk of loss for institutional customers that it did not take for retail customers, despite the latter category of customers accounting for more than 95% of the Company's customers during the Relevant Period.

90.     For instance, the Company did not commingle the assets of its institutional customers. As explained in the 2019 Comment Letter, the Coinbase Custody Trust Custodial Services Agreement (the "Institutional User Agreement"), granted institutional customers a "***segregated custody account***[2] controlled and secured by [Coinbase Custody] to store certain supported digital currencies and utility tokens ("Digital Assets"), on [the] Client's behalf," and represented that Coinbase Custody "will safekeep the Digital Assets and segregate all Digital Assets from both the (a) property of [Coinbase Custody], and (b) assets of other customers of [Coinbase Custody]."

91.     Coinbase did, however, commingle the assets of its retail customers. The Retail User Agreement explained that "Coinbase shall have no obligation to segregate by blockchain address Digital Assets owned by you from Digital Assets owned by other customers or by Coinbase." Despite this, the Individual Defendants failed to disclose the significant risks associated with such commingling. Further, the Retail User Agreement expressly represented numerous times that customers owned and controlled the digital assets held in custody by the Company. For example, the Retail User Agreement represented that "***[t]itle in Digital Assets shall at all times remain with you and shall not transfer to Coinbase***" and that, while "Coinbase shall retain control over electronic private keys associated with blockchain addresses . . . including the blockchain addresses that hold your Digital Assets[,] . . . ***You control the Digital Assets held in your Digital Asset Wallet.***"

92.     Further, Coinbase automatically opted customers into its staking services by default where such services were available on the platform. As explained by Professor Levitin, the Company's staking arrangement, whereby digital asset owners agree to lock up their holdings with

---

[2] Unless indicated otherwise, all emphasis is added.

Coinbase in order to obtain a reward or earn interest, heightened the risk that the digital assets

would be considered property of the Company's bankruptcy estate:

> Coinbase offers a staking arrangement in which it shares the profit with a 25% cut
> of the staking rewards as a "commission" and agrees to indemnif[y] [sic] the
> customer for any slashing losses if the stake is awarded the mining rights, but fails
> to successfully mine the block within the allotted time. The shared gains and
> internalized losses suggest an investment partnership in which the exchange has a
> property interest beyond the possessory interest in the underlying cryptocurrency.

93.     Additionally, the Institutional User Agreement included an "Opt-in to Division 8

of the California Commercial Code," referring to the State of California's codification of the

Uniform Commercial Code Article 8 ("Article 8"). Article 8 protects financial assets held by a

securities intermediary in the event of bankruptcy by expressly stating that such assets "are not

property of the securities intermediary, and are not subject to claims of creditors of the securities

intermediary." While digital assets are unlikely to automatically receive these protections, Article

8 provides that a crypto-custodian must have "expressly agreed with the other person that the

property is to be treated as a financial asset under [Article 8]." The Institutional User Agreement

included a provision that expressly characterized Coinbase Custody as a "securities intermediary"

and an institutional customer as an "entitlement holder" as those terms are defined in Division 8

of the California Commercial Code ("Division 8"). The Institutional User Agreement further stated

that "Under Division 8, the Digital Assets in Client's Custodial Account are not general assets of

Trust Company and are not available to satisfy claims of creditors of Trust Company." In contrast,

the Company's Retail User Agreement did not contain any such Article 8 provision.

***Coinbase Engaged in Proprietary Trading***

94.     Proprietary trading refers to the practice of a financial institution trading assets

using its own money rather than using clients' money. This allows an institution to earn the full

proceeds from a trade instead of just earning commissions. Despite statements to the contrary,

Coinbase engaged in proprietary trading, which exposed the Company to heightened risks of financial loss, reputational damage, and regulatory scrutiny.

95.     As assets on the Company's platform are not protected by the FDIC or any other such insurer, bad investments by Coinbase can place these assets at risk. Further, successful investing often requires access to information that the market lacks. As an exchange, Coinbase typically has access to market information that the average investor, including the Company's own retail customers, lacks. Accordingly, proprietary trading gives rise to conflicts of interest. As explained by SEC Chairman Gary Gensler ("Gensler"), "[c]rypto's got a lot of those challenges— of platforms trading ahead of their customers. . . . In fact, they're trading against their customers often because they're market-marking against their customers."

96.     Moreover, the Company's engagement in proprietary trading could subject it to additional regulations, including the Volcker Rule, implemented in 2010 in the wake of the financial crisis, to prevent banks from making speculative trades in securities, commodities, and derivatives. Accordingly, whether the Company engaged in proprietary trading was of significant concern for investors and market analysts throughout the Relevant Period. For example, at the Goldman Sachs Financial Services Conference on December 7, 2021, an analyst explicitly referenced the fact that Coinbase did not "take proprietary risk on the institutional side" as "one of the hallmarks of [Coinbase's] business."

97.     In reality, as the Wall Street Journal reported, Coinbase hired at least four Wall Street traders in July 2021 to launch a proprietary trading initiative referred to as the "Coinbase Risk Solutions" group. The Wall Street Journal further reported that Defendant Haas was involved in creating the group and that "[e]mployees were discouraged from sharing information about the new trading business or discussing it in internal communications."

98.    Coinbase quietly launched its proprietary trading initiative to compensate for declining prices of cryptocurrencies, including Bitcoin and Ethereum, in the second half of 2021. As cryptocurrency prices declined, so too did the Company's ability to generate transaction revenue. As reported in the Company's 2021 annual report, filed on Form 10-K with the SEC on February 25, 2022, Coinbase's total transaction revenue generated by Bitcoin declined from 44% to 25%, year-over-year, from 2020 to 2021.

***Coinbase Listed Unregistered Securities in Violation of the Federal Securities Laws***

99.    By May 2022, the SEC began investigating the Company for potential violations of the federal securities laws, including whether the Company listed unregistered securities.

100.    There are several assets which may be considered securities requiring registration, including "investment contracts." "[A]n investment contract for purposes of [federal securities law] means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946); *see SEC v. SG Ltd.*, 265 F.3d 42, 46 (1st Cir. 2001) (recognizing the following three elements for consideration under the *Howey* test: "(1) the investment of money (2) in a common enterprise (3) with an expectation of profits to be derived solely from the efforts of the promoter or a third party").

101.    Beginning in 2017, the SEC has affirmed several times that cryptocurrencies can be considered investment contracts pursuant to the *Howey* Test. Accordingly, exchanges offering the purchase and sale of cryptocurrencies are typically required to register the offer and sale of such assets pursuant to the federal securities laws, absent a valid exemption. Further, any exchange directly or indirectly effecting any transaction in a security or reporting any such transaction, in interstate commerce, is required to register as a national securities exchange pursuant to the federal

securities laws.

102.    On April 3, 2019, the SEC's Strategic Hub for Innovation and Financial Technology published a "Framework for 'Investment Contract' Analysis of Digital Assets" (the "Digital Asset Framework"). With respect to the three elements in the *Howey* Test, the Digital Asset Framework specified that cryptocurrencies typically satisfy the first two elements and that the "main issue in analyzing a digital asset under the *Howey* test is whether a purchaser has a reasonable expectation of profits (or other financial returns) derived from the efforts of others." The Digital Asset Framework further provided a non-exhaustive list of considerations relevant to a determination of whether this third element is met, including whether "[p]urchasers would reasonably expect [a promoter, sponsor, or other third party] to undertake efforts to promote its own interests and enhance the value of the network or digital asset" and whether "[t]he digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future." Affirming that these conditions are typically met with respect to cryptocurrencies, SEC Chairman Gary Gensler stated unequivocally, while testifying before Congress on May 26, 2021, that "[m]any of these tokens are investment contracts under the securities laws," explaining that the "SEC has been consistent in its communication to market participants that those who use initial coin offerings to raise capital or to engage in securities transactions must comply with the federal securities laws."

103.    On August 3, 2021, Gensler declared: "Make no mistake: To the extent that there are securities on these trading platforms, under our laws they have to register with the Commission unless they meet an exemption. Make no mistake: If a lending platform is offering securities, it also falls into SEC jurisdiction." Gensler continued, quoting his predecessor in stating that "former SEC Chairman Jay Clayton said it well when he testified in 2018: 'To the extent that digital assets

. . . are securities — and I believe every [Initial Coin Offering] I have seen is a security — we have jurisdiction, and our federal securities laws apply.'"

104.    On April 4, 2022, at the Penn Law Capital Markets Association Annual Conference, Gensler stated the following regarding digital asset exchanges generally:

> A typical trading platform has dozens of tokens on it, at least. In fact, many have well in excess of 100 tokens. As I'll address later, many of the tokens trading on these platforms may well meet the definition of "securities." . . . [W]ith so many tokens trading, ***the probability is quite remote that any given platform has zero securities.***

105.    Gensler further observed that "most crypto tokens involve a group of entrepreneurs raising money from the public in anticipation of profits — the hallmark of an investment contract or a security under our jurisdiction."

106.    During a September 8, 2022 speech, Gensler again stated that "[o]f the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities. Offers and sales of these thousands of crypto security tokens are covered under the securities laws. . . . the investing public is buying or selling crypto security tokens because they're expecting profits derived from the efforts of others in a common enterprise." As an exchange offering investors the ability to trade in hundreds of cryptocurrencies, Coinbase was aware that many of these assets would likely constitute securities under federal law.

107.    Moreover, in the years leading up to the Direct Listing, the SEC has brough several enforcement actions related to the applicability of federal securities laws to cryptocurrencies. For instance, between July 2013 and December 2022, the SEC brough 82 court actions and 45 administrative proceedings related to cryptocurrencies, including high profile actions against Ripple Labs, Inc. in 2020 and against LBRY in 2021, alleging that these platforms offered for sale unregistered securities in violation of the federal securities laws. On November 7, 2022, the U.S.

District Court for the District of New Hampshire granted summary judgment against LBRY, despite arguments that LBRY did not receive adequate notice that its offerings were subject to securities laws. The Court stated the following in its holding:

> *The SEC has not based its enforcement action here on a novel interpretation of a rule that by its terms does not expressly prohibit the relevant conduct.* Instead, the SEC has based its claim on a straightforward application of a venerable Supreme Court precedent that has been applied by hundreds of federal courts across the country over more than 70 years. . . . *LBRY is in no position to claim that it did not receive fair notice that its conduct was unlawful.*

108.    Coinbase was aware that many cryptocurrencies listed on its platform constituted securities requiring registration pursuant to the federal securities laws.

109.    In September 2019, Coinbase, along with other businesses, founded the Crypto Rating Counsel ("CRC") to "create a framework to consistently and objectively assess whether any given crypto asset has characteristics that make it more or less likely to be classified as a security under the U.S. federal securities laws" (the "CRC Framework"). The purpose of the CRC Framework was to determine whether exchanges like Coinbase could legally list a given cryptocurrency on its platform. The CRC Framework would assign a particular digital asset a rating between 1 and 5, based on consideration of the *Howey* factors, with a "score of 5 result[ing] when an asset appears to have many characteristics that are consistent with the Howey-test factors"

110.    According to a civil complaint filed by the SEC on June 6, 2023, from late 2019 through 2021, "Coinbase made available on the Coinbase Platform crypto assets with high 'risk' scores under the CRC framework it had adopted," and the Company chose to list these assets on its platform "even where it recognized the crypto assets had the characteristics of securities." The SEC further alleged in its complaint that the Company even advised issuers regarding how to avoid classification as a security under the Company's framework. In one instance, the SEC alleged that "Coinbase identified 'problematic statements' by an issuer that described its crypto asset 'with

language traditionally associated with securities,'" including terms like "'dividend,' 'interest,' 'investment' or 'investors.'"

***The Insider Trading Charges***

111.    On July 21, 2022, the SEC and the Department of Justice ("DOJ") brought insider trading charges against a former Coinbase manager, his brother, and his friend. The SEC and DOJ alleged that the former manager tipped the other two individuals about the timing of crypto assets that Coinbase planned to list. Once a major exchange like Coinbase lists a particular cryptocurrency, the price of that asset typically increases due to its increased availability for trading. Accordingly, the tippees collectively reaped more than $1.1 million in profits, purchasing 25 or more crypto assets just before they were made available for trading on Coinbase. Importantly, the SEC alleged that nine of these assets were securities.

112.    As investors and analysts reacted to the news, the Individual Defendants assuaged concerns by unequivocally stating that "Coinbase does not list securities. End of story." As discussed herein, this statement was patently untrue, and the Individual Defendants lacked a reasonable basis to make such assurances.

***Materially False and Misleading Statements Regarding the Risk of Asset Loss in the Event of Bankruptcy***

113.    On March 23, 2021, the Company filed its Registration Statement. On April 14, 2021, the Company filed the Prospectus, incorporating and forming part of the Registration Statement. The Offering Documents purported to warn that the Company's "***failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition***," while failing to disclose the risks associated with loss of assets in the event of bankruptcy. The Offering Documents further stated the following:

The loss or destruction of private keys required to access any crypto asset held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses. . . Crypto assets and blockchain technologies have been, and may in the future be, subject to security breaches, hacking, or other malicious activities. ***Any loss of private keys relating to, or hack or other compromise of, digital wallets used to store our customers' crypto assets could adversely affect our customers' ability to access or sell their crypto assets, require us to reimburse our customers for their losses, and subject us to significant financial losses in addition to losing customer trust in us and our products.***

114.    The Offering Documents continued, representing that "[t]he Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys." While purporting to warn investors of various risks regrading "customers' ability to access or sell their crypto assets," the Individual Defendants withheld from investors the substantial risk of asset loss in the event of bankruptcy.

115.    With respect to the Company's staking services, the Offering Documents stated the following:

Stake. Certain blockchain protocols, such as Tezos, rely on staking, an alternative way to validate blockchain transactions. Network participants can designate a certain amount of their crypto assets on the network as a stake (similar to a security deposit) to validate transactions and get rewarded in kind from the network. Today, staking crypto assets is a technical challenge for most users. Staking independently requires a participant to run their own hardware, software, and maintain close to 100% up-time. We provide a service known as "Delegated Proof of Stake," which reduces the complexities of staking and ***allows our retail users to maintain full ownership of their crypto assets while earnings staking rewards.*** In return, we earn a commission on all staking rewards received.

116.    On May 13, 2021, the Company hosted an earnings call to discuss its first quarter 2021 financial results (the "1Q21 Earnings Call"). In response to a question regarding the Company's efforts to compete with exchanges offering lower fees, Defendant Haas stated the following:

Why don't I take this one? So just to be clear, our biggest focus right now is to keep up with the current demand. We are not focused on competing with fees. We are not trying to even win on fees. We're trying to win on being the most trusted, easiest to use, on providing all the assets that our customers want to transact with. On being able to provide to yield on crypto assets, the opportunity to engage in DeFi, as Brian just talked about. ***Our customers choose us because they trust us to keep their assets safe.*** We provide an easy-to-use platform and a growing number of ways to transact and use crypto assets. Our institutions are choosing us for our secure storage as well, offered by our custody solution, the deep liquidity we offer on our exchange, and our best trading execution, where we are able to route orders across more than 10 liquidity venues, including other exchanges, to find the best price to execute client orders. ***On the retail side, we're bundling custody and storage services into our trading fee. And our customers really see value in the fees that we provide based on the services.***

117.    On May 14, 2021, the Company filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2021 (the "1Q21 10-Q"), which purported to warn that the Company's "failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition." The 1Q21 10-Q continued, stating:

> ***The loss or destruction of private keys required to access any crypto assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses.***

118.    The 1Q21 10-Q further stated that "***[t]he Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys.***"

119.    On August 10, 2021, the Company filed a quarterly report on Form 10-Q for the second quarter of 2021, which repeated the same materially false and misleading statements that were contained in the 1Q21 10-Q.

120.    On November 10, 2021, the Company filed a quarterly report on Form 10-Q for the third quarter of 2021, which repeated the same materially false and misleading statements that were contained in the 1Q21 10-Q.

121.    On November 30, 2021, the following exchange occurred between Defendant Armstrong and Union Square Ventures, LLC partner Frederick R. Wilson during the J.P. Morgan Crypto Economy Forum:

[Wilson:] How do you think about custody and self-custody? When we first invested in Coinbase, one of the first conversations you and I had was about cold storage and securing the Bitcoin that our customers had with us .

[Defendant Armstrong:] Yes. So you're right. The early on people were all worried about, how do you store crypto? And people were losing it accidentally. There was famously things like Mt. Gox, where some exchanges got hacked and funds were lost.

[Wilson:] Something like 10% of all crypto in the world is stored at Coinbase?

[Defendant Armstrong:] Yes. Yes, a little over 10% now. So that's a great indication of trust that people have in centralized custody. Especially for our institutional customers, by the way. *Most of them today seem to really want to have someone like us, we're qualified custodian, so they can store it with us.*

*Now there has been this really -- this segment has always been there, but I think it's going to keep growing over time. It's largely retail, but it's the self-custodial preference that people have, which is 'Hey, I want to store my own crypto.' And there's some nice properties of that. It's not just – I make sure it's never going to be seized or something like that.*

122.    On December 7, 2021, the following exchange occurred between Defendant Choi and William Alfred Nance, a Goldman Sachs research analyst during the Goldman Sachs US Financial Services Conference:

[Nance]: Pricing usually comes up with investors as one of the biggest concerns for the business, just given the concentration of retail commissions in the P&L. The company has been pretty upfront that trading fees will likely come down over time, but probably not in the near term. What do you think of the catalyst for seeing more significant pricing pressure in the industry? And I guess, as a management team, how do you ensure that Coinbase is ready for that?

[Defendant Choi]: I mean I know this is like the #1 question and probably top of mind for everybody in the room. We – it's one of those things where we know at some point there will be compression, but we aren't seeing any signs of it yet. And so we're ready for that day whenever it is. But we -- and the way that we think about it is, we want to control our own destiny. And so the things that we're

investing in are subscription and services revenue streams that are much more predictable. The more that the subscription and services revenue streams can pay off our operating expenses such that the trading revenue is gravy on top, that's a great situation to be in. And we're at the beginning of that. But that -- I think we feel very good about the trajectory in the subscription services revenue, if you have a look at that.

So I guess the TLDR is that I think many of you have probably seen that the retail and institutional volumes will vary, and so that can contribute to the take rate that we get. But we haven't yet seen the actual compression. *We haven't changed our fee structure on the retail side yet. I think that consumers are more than willing to pay a certain fee percentage for the services we offer, particularly the security we offer. We have world-class security in custody when you purchase assets with Coinbase and hold them in Coinbase.* So I guess it's a long-winded way of saying like, yes, it will come at some point, but we haven't seen any signs of it yet. And I think we're making the right investments in subscription services to get to that place where it shouldn't be that much of a concern over the longer term.

123.     On February 25, 2022, the Company filed an annual report on Form 10-K with the

SEC for its fiscal year 2021 (the "2021 10-K"), which was signed by Defendants Armstrong, Haas,

Jones, Andreessen, Ehrsam, Haun, Kramer, Lütke, Rajaram, and Wilson. The 2021 10-K repeated

the same materially misleading statements that were contained in the 1Q21 10-Q. With respect to

the Company's hosted wallet and its Coinbase Wallet product, the 2021 10-K stated:

We serve as the users' primary crypto account, both hosted and selfhosted – providing safe, trusted, and easy-to-use tools to discover, invest, stake, store, spend, earn, borrow, and use crypto assets.

We provide our retail users a hosted wallet which allows them to securely and easily discover, buy, sell, send and receive 139 crypto assets with a growing number of fiat currencies or to trade one crypto asset for another crypto asset. In our hosted wallet, we provide custody services on our customer's behalf. We charge a fee when users buy, sell, or convert crypto assets in either a fiat-to-crypto or crypto-to-crypto trade. . . . We also provide services to allow our customers to participate in blockchain rewards paid by underlying protocols. The largest of these is staking where we offer a service known as Delegated Proof of Stake, *which reduces the complexities of staking and allows our retail users to maintain full ownership of their crypto assets while earning staking rewards.* In return, we receive a commission on all staking rewards earned.

***Coinbase Wallet, a separately managed retail software product, allows users to self-custody crypto assets and NFTs in one place and interact with the***

***cryptoeconomy and Web3***, including an expanded set of approximately 5,500 crypto assets and decentralized applications. A fee is charged for select activities executed in the self-hosted wallet.

124.    On March 9, 2022, the following exchange occurred between Defendant Haas and

an unidentified analyst at the Morgan Stanley Technology, Media, and Telecom Conference:

> [Analyst]: It'd be great to hear, #1, where you're investing and then #2, I know there was a lot of discussion around earnings call about kind of what's the near -- how should investors think about near-term revenue potential for some of these significant 2022 investments? So feel free to address.

> [Defendant Haas]: Yes. That would be the #1 question we've had as follow-up from earnings, so I also had the opportunity to share with you all. So one of the things that we think about is, we want to be a company of repeatable innovation, which means that we're always investing on the frontier. We're always taking measured bets, and we want to have a lot of bets, because we don't know exactly how the shape of the future of crypto economy will emerge. ***So, we know what we're good at. We know that we're a great, safe place to buy your first Bitcoin to trade to safely store.***

125.    On April 20, 2022, Coinbase filed a proxy statement on Form DEF 14A with the

SEC (the "2022 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of

Defendants Ehrsam, Lütke, and Wilson to serve for another one-year term on the Company's

Board and the compensation of certain of the Company's executive officers, including Defendants

Armstrong, Choi, Haas, and Grewal.

126.    The 2022 Proxy touted the Company's efforts in "building a best-in-class

infrastructure to enable easy, safe, and secure on-ramps and access into the global

cryptoeconomy."

127.    The statements identified above were materially false and misleading and omitted

to state material adverse facts necessary to make the statements not misleading because they failed

to disclose that: (i) digital assets held in Coinbase's custody were at significant risk in the event of

bankruptcy; (ii) the Individual Defendants lacked a reasonable basis to state, for instance, that

retail users would "maintain full ownership of their crypto assets while earning staking rewards,"
due to the uncertain legal treatment of digital assets in the event of bankruptcy, particularly in the
context of the Company's staking services; and (iii) the foregoing posed a substantial risk to the
Company's ability to maintain its existing retail customer base and to sustain revenue growth
during the Relevant Period.

***Materially False and Misleading Statements Regarding the Company's Proprietary Trading
Activities***

128.    During the Company's Investor Day on March 23, 2021, which was incorporated
into the Registration Statement and Prospectus through the Free Writing Prospectus filed on March
24, 2021, Defendant Haas stated the following in response to a question regarding potential
conflicts of interest that could arise in the context of Coinbase operating as both a broker and an
exchange:

> So it's true. On our retail side, we operate a full broker that includes the retail
> brokerage piece, as well as custody embedded in that retail trading experience. On
> the institutional side, we operate an exchange, a broker, and then a custodian. ***What
> I think is important about the Coinbase business model is that we have set up our
> business such that there's not a conflict. We do not proprietarily trade against
> our clients. What this means is that we're only executing orders on our
> customer's behalf and seeking for the best execution on those customer's orders.***

129.    The Offering Documents stated the following regarding the Company's "crypto
asset investments":

> ***We view our crypto asset investments as long term holdings and we do not plan
> to engage in regular trading of crypto assets.*** Therefore, we do not anticipate
> material variability to our earnings or cash flows from the monetization of these
> investments. During times of instability in the market of crypto assets, we may not
> be able to sell our crypto assets at reasonable prices or at all. As a result, our crypto
> assets are less liquid than our existing cash and cash equivalents and may not be
> able to serve as a source of liquidity for us to the same extent as cash and cash
> equivalents. Realized gains and impairment losses related to crypto assets held for
> investment did not have a material impact on our consolidated statements of
> operations for all years presented. ***Customer accommodations are fulfilled with
> crypto assets held for operational purposes and we do not expect material***

***variability in our earnings from these crypto assets.***

130.    The Offering Documents further stated the following with respect to its crypto assets: "Other operating expense includes cost of our crypto assets used to fulfill customer accommodation transactions. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets***."

131.    The Offering Documents stated the following in a section titled "Other revenue":

> Other revenue includes the sale of crypto assets when we are the principal in the transaction. ***Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. We fulfill customer accommodation transactions using our own assets for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions.*** We have custody and control of these crypto assets prior to the sale to the customer and record revenue at the point in time when the sale is processed. Accordingly, we record the total value of the sale as revenue and the cost of the crypto asset in other operating expense. Transactions involving our sale of crypto assets represented less than 11% of our total revenue for the fiscal year ended December 31, 2020.

132.    Similarly, the Offering Documents stated the following regarding the Company's crypto assets:

> Other revenue includes sale of crypto assets and corporate interest income. ***Periodically, as an accommodation to customers, the Company may fulfill customer transactions using the Company's own crypto assets.*** The Company has custody and control of the crypto assets prior to the sale to the customer and records revenue at the point in time when the sale to the customer is processed. Accordingly, the Company records the total value of the sale in other revenue and the cost of the crypto assets in other operating expense within the consolidated statements of operations. The cost of crypto assets used in fulfilling customer transactions was $131.9 million and $38.6 million for the years ended December 31, 2020 and December 31, 2019, respectively.

133.    The Prospectus included a letter to shareholders. Therein, Defendant Armstrong highlighted the Company's "culture that doesn't take shortcuts to try and make a quick buck."

134.    On May 14, 2021, the Company filed its 1Q21 10-Q, which repeated the same misleading statements regarding the Company's "crypto asset investments" that were contained in

the Offering Documents, identified above in ¶¶129-132.

135.    On August 10, 2021, the Company filed its 2Q21 10-Q, which repeated the same misleading statements regarding the Company's "crypto asset investments" that were contained in the Offering Documents, identified above in ¶¶129-132.

136.    On August 19, 2021, the Company stated the following in a blog post titled "Coinbase updates investment policy to increase investments in crypto assets":

> Our crypto asset investment allocation will be driven by our aggregate custodial crypto balances — meaning our customers will drive our investment strategy. Our investments will be continually deployed over a multi-year window using a dollar cost averaging strategy. ***We are long term investors and will only divest under select circumstances, such as an asset delisting from our platform. All trades will be executed via our over the counter desk or away from our exchange to avoid any conflict of interest with our customers.***
>
> ***We may increase our allocation over time as the cryptoeconomy matures.*** We believe that in the future, more and more companies will hold crypto assets on their balance sheet. We hope by incorporating more crypto assets into our own corporate financial practices, we can take another step towards building a more open cryptoeconomy.

137.    On November 10, 2021, the Company filed its 3Q21 10-Q, which repeated the same misleading statements regarding the Company's "crypto asset investments" that were contained in the Offering Documents, identified above in ¶¶129-132.

138.    On December 7, 2021, the following exchange occurred between Defendant Choi and Goldman Sachs research analyst William Alfred Nance:

> [Nance]: And Coinbase doesn't take proprietary risk on the institutional side. I think that's been one of the – that's been one of the hallmarks of your business relative to some of the competitors. Why is that important for your business? How is that a competitive advantage?
>
> [Defendant Choi]: I mean I think it's kind of obvious in a way. ***It's just people don't want to feel like you're trading -- institutions don't want to feel like you're going to be trading against them. And so we've always had a clear line about not doing that.***

139.    On December 8, 2021, Defendant Haas testified before the U.S. House of Representatives Committee on Financial Services, during a hearing titled "Digital Assets and the Future of Finance: Understanding the Challenges and Benefits of Financial Innovation in the United States." During the hearing, in response to a question from Congresswoman Nydia M. Velazquez regarding the Company's pricing of digital assets, Defendant Haas stated the following:

> ***Coinbase is an agency-only platform. We do not engage in proprietary trading on our platform.*** All prices established in our platform are due to market makers, so we offer a platform for our customers to come together and offer bids and asks on a variety of currencies that we offer on our platform. So, the market price is determined by the market participants.

140.    Representative Alexandria Ocasio-Cortez then prompted Defendant Haas to clarify the statement identified above:

> Before I get into the heart of my questions today, there was a slight discrepancy in some of the testimony and questioning from earlier today that I wanted Ms. Haas to clarify very quickly. Earlier in the hearing, Representative Velazquez asked about proprietary trading on the Coinbase platform, and in that moment, I believe you told her that, "Coinbase does not engage in proprietary trading on our platform. All prices are established, et cetera." However, in looking at the Coinbase rules under Section 3.21 of Coinbase corporate ops, it says that Coinbase, Inc., which owns and operates Coinbase Pro and Exchange, also trades its own corporate funds on Coinbase Pro and Exchange, and I just wanted to give you, briefly, the opportunity to clarify.

141.    In response, Defendant Haas stated the following:

> Thank you so much for the opportunity to clarify. ***There are a few things that we do in our business. One is, we do have a corporate investment portfolio that every month we make an investment in crypto and add to our balance sheet. We have not sold that. We don't trade it actively, but we do increase the investment on a monthly basis on pre-established investment protocols. We do buy those on our exchange.***

142.    On February 25, 2022, the Company filed its 2021 10-K, which repeated the same misleading statements regarding the Company's "crypto asset investments" that were contained in the Offering Documents, identified above in ¶¶129-132.

143.    On May 10, 2022, the Company filed a quarterly report on Form 10-Q with the SEC, for its first fiscal quarter of 2022 (the "1Q22 10-Q"), which repeated the same misleading statements regarding the Company's "crypto asset investments" that were contained in the Offering Documents, identified above in ¶¶129-132.

144.    On August 9, 2022, the Company filed a quarterly report on Form 10-Q with the SEC, for its second fiscal quarter of 2022 (the "2Q22 10-Q"), which repeated the same misleading statements regarding the Company's "crypto asset investments" that were contained in the Offering Documents, identified above in ¶¶129-132.

145.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) contrary to express indications that Coinbase does "not engage in proprietary trading on [its] platform," the Company did, in fact, engage in such activities; (ii) furthermore, Coinbase did not just engage in trading for "operational purposes" or as an "accommodation" to customers during "system disruptions," as stated in the Offering Documents and in each quarterly filing throughout the Relevant Period; and (iii) the Company's proprietary trading activities subjected Coinbase to heightened risks of financial loss, reputational damage, and regulatory scrutiny.

**Materially False and Misleading Statements Regarding Whether the Company Listed Unregistered Securities**

146.    The 1Q22 10-Q, filed on May 10, 2022, stated the following with respect to the Company's legal and regulatory proceedings:

> **The Company has received investigative subpoenas from the SEC for documents and information about certain customer programs, operations, and intended future products, including the Company's stablecoin and yield-generating products**. Based on the ongoing nature of this matter, the outcome remains uncertain and the Company cannot estimate the potential impact, if any, on its

business or financial statements at this time.

147.    The 1Q22 10-Q further purported to warn about the risk that Coinbase would be subject to regulatory scrutiny or enforcement actions related to the characterization of cryptocurrencies on its exchange as securities:

> [A] particular crypto asset's status as a 'security' in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset, we may be subject to regulatory scrutiny, inquiries, investigations, fines, and other penalties, which may adversely affect our business, operating results, and financial condition.

148.    On July 21, 2022, in the wake of the SEC and the DOJ's insider trading charges, brought against one of the Company's former employees, Coinbase published a blog post titled "*Coinbase does not list securities. End of story.*" Therein, Defendant Grewal made the following statements on behalf of the Company:

> *Coinbase does not list securities. End of story.*
>
> * * *
>
> *TLDR: Coinbase does not list securities on its platform. Period. We have said it before, but given today's events, it bears repeating.*
>
> * * *
>
> Seven of the nine assets included in the SEC's charges are listed on Coinbase's platform. *None of these assets are securities. Coinbase has a rigorous process to analyze and review each digital asset before making it available on our exchange — a process that the SEC itself has reviewed.*
>
> * * *
>
> But in the absence of a concrete digital asset securities regulatory framework from the SEC, *we remain confident that Coinbase's rigorous review process keeps securities off Coinbase's platform.*

149.    On July 25, 2022, Defendant Grewal stated the following on behalf of the Company on his Twitter account: "I'm happy to say it again and again: *we are confident that our rigorous*

*diligence process—a process the SEC has already reviewed—keeps securities off our platform*."

150.    On July 25, 2022, Reuters published an article titled "Crypto Exchange Coinbase Faces SEC Probe Over Securities," which quoted Defendant Grewal as stating the following on behalf of the Company: "*We are confident that our rigorous diligence process — a process the SEC has already reviewed — keeps securities off our platform*."   The Reuters article further reported that "[a] Coinbase spokesperson told Reuters *the company does not list securities on its platform.*"

151.    On August 9, 2022, during the Company's second quarter 2022 earnings call, Defendant Haas stated the following in response to a question regarding the SEC and DOJ's insider trading charges and the SEC's allegations that Coinbase was listing unregistered securities:

> So we absolutely take everything the SEC says into consideration when we look at our listing framework, and we look at these assets. *We do not believe at this time that the assets that we listed on our platform are securities. Despite the additional information on these nine assets, based on our assessment these nine assets are not securities.* We have filed a petition with the SEC because we do believe that there is additional clarity needed for all market participants to have very clear rules on what is or what is not a security for crypto assets. And we've pointed out a lot of the challenges that there are with interpreting Howey, and questions that we would benefit by having the SEC more clearly articulate to the market so we can all have the same assessment of each digital asset security. *But at this time we do not list securities.* We look forward to a more productive conversation with the SEC on these topics.

152.    On February 8, 2023, Defendant Grewal stated on behalf of the Company on his Twitter account that "*[s]taking is not a security*."

153.    The same day, Defendant Armstrong stated the following on his Twitter account: "*We're hearing rumors that the SEC would like to get rid of crypto staking in the U.S. for retail customers.* I hope that's not the case as I believe it would be a terrible path for the U.S. if that was allowed to happen."

154.    On February 10, 2023, Coinbase published a blog post titled "Coinbase's staking

services are not securities. And here's why." Therein, Defendant Grewal made the following statements on behalf of the Company:

> Tldr: Staking is not a security under the US Securities Act, nor under the Howey test. Trying to superimpose securities law onto a process like staking doesn't help consumers at all and instead imposes unnecessarily aggressive mandates that will prevent US consumers from accessing basic crypto services and push users to offshore, unregulated platforms.

* * *

> Our staking products are not securities.

* * *

> ***Is staking a security? To put it simply, no. Staking is not a security under the US Securities Act, nor under the Howey test,*** which the SEC uses to determine whether an investment contract is a security.

155. The same day, Defendants Armstrong and Grewal retweeted these statements on their Twitter accounts.

156. On February 12, 2023, Defendant Armstrong stated the following on his Twitter account on behalf of Coinbase: "***Coinbase's staking services are not securities. We will happily defend this in court if needed***."

157. On February 21, 2023, during the Company's fiscal year 2022 earnings call, Defendant Grewal stated the following in response to a question regarding what differentiates Coinbase staking from the staking services offered by one of its competitors, Kraken, who had recently been the subject of an SEC enforcement action:

> ***Coinbase's staking products are not securities***, and so they are not affected by this news. Staking on Coinbase continues to be available to our customers and stake assets continue to earn rewards. ***The staking products that we offer on Coinbase are fundamentally different from the yield products that were described in the reinforcement action against Kraken.***

158. On February 23, 2023, the Company filed its 2022 annual report on Form 10-K

47

with the SEC (the "2022 10-K"), which was signed by Defendants Armstrong, Haas, Jones, Andreessen, Ehrsam, Haun, Kramer, Lütke, Rajaram, and Wilson. The 2022 10-K stated the following:

> The Company has received investigative subpoenas and requests from the SEC for documents and information about certain customer programs, operations, and existing and intended future products, including the Company's processes for listing assets, the classification of certain listed assets, its staking programs, and its stablecoin and yield-generating products. ***Based on the ongoing nature of these matters, the outcomes remain uncertain and the Company cannot estimate the potential impact, if any, on its business or financial statements at this time.***

159.    On March 1, 2023, during an interview on Bloomberg Television, Defendant Armstrong stated that "[o]ur staking product is not a security."

160.    On March 22, 2023, after receiving a Wells Notice from the SEC, Coinbase published a blog post titled "We asked the SEC for reasonable crypto rules for Americans. We got legal threats instead." Therein, Defendant Grewal stated on behalf of the Company that "***Coinbase does not list securities***" and that "[t]he bottom line remains: ***Coinbase does not list securities or offer products to our customers that are securities***." Defendant Grewal continued, stating that "***our staking services are not securities under any legal standard, including the Howey test which assesses whether a product is an investment contract***."

161.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Individual Defendants lacked a reasonable basis to repeatedly assure that the Company did not list securities on its platform; (ii) Coinbase listed digital assets on its platform with high risk scores under its own CRC framework, indicating that these assets were securities; (iii) by no later than May 2022, the Individual Defendants were aware that the SEC had begun investigating Coinbase for listing unregistered securities; and (iv) by January 2023, the SEC had

begun pursuing an enforcement investigation, so representations that "the outcomes [of the SEC's investigative subpoenas] remain[ed] uncertain and the Company [could not] estimate the potential impact. if any, on its business" as of February 23, 2023 were materially misleading.

***Materially False and Misleading Statements Regarding the Company's Internal Controls, Risk Management Function, and its Legal and Regulatory Compliance***

162.    On April 20, 2022, Coinbase filed the 2022 Proxy. With respect to the Company's "corporate governance practices," the 2022 Proxy highlighted Coinbase's "Comprehensive risk oversight practices, including cybersecurity, data privacy, legal, and regulatory matters, and other critical evolving areas."

163.    The 2022 Proxy further stated the following with respect to its risk assessment and risk management functions:

> Our Audit and Compliance Committee is primarily responsible for overseeing our risk management processes. Our Audit and Compliance Committee determines our appropriate level of risk, assesses the specific risks that we face, and reviews management's strategies for adequately mitigating and managing the identified risks. Although our Audit and Compliance Committee administers this risk management oversight function, our Board of Directors oversees the Audit and Compliance Committee's work, with each other committee of our Board of Directors assisting in discharging its oversight duties and in addressing risks inherent in their respective areas. The Audit and Compliance Committee reviews our major financial risk exposures and the steps management has taken to monitor and control such exposures, including our procedures and related policies with respect to risk assessment and risk management. Our Audit and Compliance Committee also reviews matters relating to compliance, cybersecurity, and security, and reports to our Board of Directors regarding such matters. The Compensation Committee reviews risks and exposures associated with our compensation plans and programs. The Nominating and Corporate Governance Committee reviews and assesses risks relating to our corporate governance practices, reviews and assesses our performance, risks, controls, and procedures relating to corporate responsibility, reviews the independence of our Board of Directors, and reviews and discusses our Board of Directors' leadership structure and role in risk oversight. We believe this division of responsibilities is an effective approach for addressing the risks we face and that the leadership structure of our Board of Directors supports this approach.

164.    With respect to the Company's internal controls and its legal and regulatory

compliance, the 2022 Proxy stated that the Audit Committee was responsible for "considering the adequacy of our internal controls and internal audit function," "reviewing and discussing with management our financial statements and the reports we file with the SEC," and "reviewing and overseeing our policies related to legal compliance risks."

165.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because, despite descriptions of the Board's and its committees' oversight responsibilities with respect to risk management, internal controls, and legal and regulatory compliance, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to violate the federal securities laws and to issue the false and misleading statements detailed herein.

***The Truth Emerges***

166.    On May 10, 2022, Coinbase filed its 1Q22 10-Q. Therein, the Company disclosed for the first time that "the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors." The 1Q22 10-Q further stated the following regarding the risk of asset loss in the event of bankruptcy:

> Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results, and financial condition. As of March 31, 2022, we held $256 billion in custodial fiat currencies and cryptocurrencies on behalf of customers. Supported crypto assets are not insured or guaranteed by any government or government agency. . . . Our success and the success of our offerings requires significant public confidence in our and our partners' ability to properly manage customers' balances and handle large and growing transaction volumes and amounts of customer funds.

* * *

Moreover, ***because custodially held crypto assets may be considered to be the***

*property of a bankruptcy estate, in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors. This may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition.*

167.     The same day, Defendant Armstrong acknowledged that Coinbase had failed to properly disclose this risk, stating the following on Twitter:

*For our retail customers, we're taking further steps to update our user terms such that we offer the same protections to those customers in a black swan event. We should have had these in place previously, so let me apologize for that.*

*This disclosure makes sense in that these legal protections have not been tested in court for crypto assets specifically, and it is possible, however unlikely, that a court would decide to consider customer assets as part of the company in bankruptcy proceedings.*

*We should have updated our retail terms sooner, and we didn't communicate proactively when this risk disclosure was added. My deepest apologies, and a good learning moment for us as we make future changes.*

168.     On this news, the price of Coinbase common stock declined more than 26% in one day, from a close of $72.99 per share on May 10, 2022 to a close of $53.72 per share on May 11, 2022.

169.     Analysts reacted quickly to the news, attributing the decline in the Company's stock price to the risk disclosure. For instance, on May 11, 2022, Piper Sandler published a report titled "Shares Take Another Leg Down On New SEC Custody Risk Disclosure Requirements," which stated the following:

COIN shares trading down ~23% this morning. Along with a 1Q22 earnings miss reported last night, *we suspect the decline is being driven by language in the 10-Q filing (also released last night) about the consideration of customer's crypto assets under custody in the event of bankruptcy.* Late last night, a twitter thread was posted from the account of CEO Brian Armstrong addressing the updated disclosures and reassuring the public that COIN is not at risk of bankruptcy and that customer funds are safe.

* * *

COIN included this new risk disclosure in its 10-Q filing. It goes on to say that this fact could negatively impact COIN's financial results as clients could now view COIN's custody services as more risky and less attractive.

170. The same day, Protocol published an article titled "Coinbase's disturbing disclosure: 'If we go bankrupt….'" The Protocol article quoted Alex Johnson, author of the Fintech Takes newsletter, who characterized the Company's failure to properly disclose the risk of asset loss in the event of bankruptcy as a "bizarre lapse," stating "***I don't understand how they possibly could have forgotten to do that, but apparently they did.***"

171. On May 13, 2022, New Constructs issued a report titled "1Q22 Earnings Shows Coinbase's Struggles." Therein, New Constructs warned investors: "Don't Ignore New Bankruptcy & Regulatory Risk," and stated the following:

> As noted in Coinbase's latest 10-Q, the company has to address the real risk of bankruptcy. The following statement was added this quarter: "in the event of a bankruptcy, the crypto assets we hold in custody on behalf of our customers could be subject to bankruptcy proceedings and such customers could be treated as our general unsecured creditors."

> This public acknowledgement could spark fear in the company's clients. The fear of bankruptcy proceedings could drive clients to cash out their investments as quickly as possible, further weakening Coinbase's business, and bringing the company even closer to bankruptcy

172. On July 25, 2022, Bloomberg published an article titled "Coinbase Faces SEC Probe on Crypto Listings; Shares Tumble," which revealed that the SEC had been investigating whether Coinbase "let Americans trade digital assets that should have been registered as securities." The Bloomberg article further stated the following:

> The US Securities and Exchange Commission's scrutiny of Coinbase has increased since the platform expanded the number of tokens in which it offers trading, said two of the people, who asked not to be named because the inquiry hasn't been disclosed publicly. The probe by the SEC's enforcement unit predates the agency's

investigation into an alleged insider trading scheme that led the regulator last week to sue a former Coinbase manager and two other people.

* * *

As the largest US trading platform, Coinbase lets Americans trade more than 150 tokens. If those products were deemed securities, the firm could need to register as an exchange with the SEC.

* * *

Coinbase has repeatedly sparred with the agency over how it oversees the industry, and the firm last week called on the SEC to propose clearer rules. Meanwhile, after taking a relatively cautious approach for years, Coinbase has boosted its token offerings.

173. On this news, the price of Coinbase stock declined roughly 21% in one day, from a close of $67.07 per share on July 25, 2022 to a close of $52.93 per share on July 26, 2022.

174. Market analysts attributed the decline in the Company's stock price to the Bloomberg article. For instance, on July 26, 2022, Morningstar issued a report titled "Reports of Regulatory Scrutiny from the SEC send Coinbase Shares Lower." Therein, Morningstar stated that "Coinbase has fallen further on reports in Bloomberg and other media that the SEC is investigating the company over whether some of the cryptocurrencies that have been listed on its platform should have been registered as securities before issuance. . . . This carries risk for Coinbase as the firm cannot allow its users to trade unregistered securities, and is not an official securities exchange."

175. On September 22, 2022, The Wall Street Journal issued a report revealing that, contrary to the Individual Defendants' repeated assurances, the Company had been engaged in proprietary trading during the Relevant Period. Specifically, The Wall Street Journal revealed that the Company had launched Coinbase Risk Solutions in July 2021 "to generate profit, in part, by using the [C]ompany's cash to trade and 'stake,' or lock up, cryptocurrencies."

176.    Among other things, The Wall Street Journal reported that in 2022, the Company invested $100 million raised from the sale of a structured note to "profit in cryptocurrency markets" and explained that "[t]he trade occurred after the crypto market started to fall from its all-time high, eating into Coinbase's business."

177.    The Wall Street Journal further reported that the highest levels of Company management, including Defendant Haas, were involved in the creation of the Coinbase Risk Solutions unit and that "[e]mployees were discouraged from sharing information about the new trading business or discussing it in internal communications."

178.    On this news, the price of Coinbase stock declined 6.9% from a close of $67.64 per share on September 21, 2022 to a close of $62.94 per share on September 22, 2022.

179.    Immediately following the issuance of The Wall Street Journal report, the Company acknowledged in a blog post that "Coinbase does, from time to time, purchase cryptocurrency as principal, including for our corporate treasury and operational purposes." In its statement, the Company did not deny any of the allegations in The Wall Street Journal report.

180.    On September 27, 2022, Digital Wealth News published an article titled "The Wall Street Journal & Coinbase "Have Words" . . . Whose [sic]Right?"  Therein, Digital Wealth News questioned, "[w]hen is proprietary trading not proprietary trading? It seems the venerable Wall Street Journal defines the practice one way and cryptocurrency exchange Coinbase has a different view. Is it really a big deal? Well yes, it kind of is, especially for investor perception." The article included a statement issued by Coinbase, representing that the Company did "not view this as proprietary trading because its purpose is not for Coinbase to benefit from short-term increases in value of the cryptocurrency being traded." Digital Wealth News then challenged the Company's characterization, stating that "[t]hat statement sure doesn't sound like the true definition of

proprietary trading."

181.    On October 10, 2022, Times Square Investment Journal published an article titled "Coinbase's Stock Drops As Proprietary Trading Experiment Exposes Potential Conflicts Of Interest," explaining that "Coinbase's foray into prop trading could fray the lines of trust between the company's executives and its investors."

182.    On March 22, 2023, the Company filed a current report on Form 8-K with the SEC, disclosing that it had received a Wells Notice from the SEC earlier that day. Specifically, the Company revealed the following:

> On March 22, 2023, Coinbase Global, Inc. and Coinbase, Inc. (collectively, the "Company") received a "Wells Notice" from the Staff ("Staff") of the Securities and Exchange Commission ("SEC") stating that the Staff has advised the Company that it made a "preliminary determination" to recommend that the SEC file an enforcement action against the Company alleging violations of the federal securities laws, including the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the Securities Act of 1933, as amended (the "Securities Act"). Based on discussions with the Staff, the Company believes these potential enforcement actions would relate to aspects of the Company's spot market, staking service Coinbase Earn, Coinbase Prime and Coinbase Wallet.

183.    The same day, the Company stated the following in a blog post regarding the Wells Notice:

> The Wells notice comes out of the investigation that we disclosed last summer. Shortly after that investigation began, the SEC asked us if we would be interested in discussing a potential resolution that would include registering some portion of our business with the SEC.

> * * *

> ***We met with the SEC more than 30 times over nine months***, but we were doing all of the talking. In December 2022, we asked the SEC again for some feedback on our proposals. The SEC staff agreed to provide feedback in January 2023. ***In January, the day before our scheduled meeting, the SEC canceled on us and told us they would be shifting back to an enforcement investigation.***

> * * *

The investigation is still at a very early stage. We have produced documents and provided two witnesses for testimony, one on the basic aspects of our staking services and one on the basic operation of our trading platform.

184.    On this news, the price of Coinbase stock declined roughly 14% in one day, from a close of $77.14 per share on March 22, 2023 to a close of $66.30 per share on March 23, 2023.

185.    In response to the disclosure of the Wells Notice, TD Cowen issued a report on March 24, 2023, downgrading Coinbase to "Underperform [ ] on incremental risk to operations for the SEC Wells Notice and crypto banking crackdown."

186.    Finally, on June 6, 2023, the SEC filed a complaint against Coinbase, alleging that the Company had violated the federal securities laws by listing unregistered securities and by failing to register "with the SEC as a broker, national securities exchange, or clearing agency, thus evading the disclosure regime that Congress has established for our securities markets." According to the SEC Complaint, "Coinbase made available on the Coinbase Platform crypto assets with high 'risk' scores under the CRC framework it had adopted," and the Company chose to list these assets on its platform "even where it recognized the crypto assets had the characteristics of securities." The SEC further alleged in its complaint that the Company even advised issuers regarding how to avoid classification as a security under the Company's framework. In one instance, the SEC alleged that "Coinbase identified 'problematic statements' by an issuer that described its crypto asset 'with language traditionally associated with securities,'" including terms like "'dividend,' 'interest,' 'investment' or 'investors.'"

187.    The SEC Complaint charged Company management with "elevat[ing] its interest in increasing its profits over investors' interests, and over compliance with the law and the regulatory framework that governs the securities markets and was created to protect investors and the U.S. capital markets." Among other relief, the SEC sought civil money penalties and an order

mandating Coinbase to disgorge all ill-gotten gains resulting from its violations of the federal securities laws.

188.    Market analysts reacted immediately. For instance, Bloomberg published an article the same day, explaining that "[i]n a 101-page lawsuit filed Tuesday in federal court in New York, the SEC alleged that Coinbase for years evaded its rules by letting users trade numerous crypto tokens that were actually unregistered securities." The Bloomberg article further explained that "[t]he SEC also accused Coinbase of breaking the agency's rules with its 'staking' service. That product offers customers a return in exchange for providing their tokens to be used to facilitate transactions on a blockchain."

189.    On this news, the price of Coinbase stock declined significantly from its close of $58.71 per share on June 5, 2023. On June 6, 2023, price of Coinbase stock opened at just $47.10 per share before closing at $51.61 per share by the end of the day.

190.    Market analysts reported that the SEC Complaint could lead to substantial damage to the Company. For example, on June 6, 2023, Barclays issued a report, which stated the following:

> [I]n the suit, *the SEC also orders Coinbase to 'disgorge . . . all ill-gotten gains'* resulting from the alleged violations, with interest – in other words, *the company would be required to pay a penalty totaling the entirety of revenues generated from trading in digital asset securities*. If we were to just assume the SEC is referring to trading in all non-BTC/ETH securities, based on data we have going back to 1Q20, and including the staking program, *we estimate the total of these revenues would be just over $6B. This would be in addition to unspecified civil penalties*.

**Insider Sales**

191.    During the Relevant Period, Defendants Armstrong, Choi, Haas, Grewal, Jones, Andreessen, Ehrsam, Haun, and Wilson (the "Insider Trading Defendants") each made unusually timed sales of Company stock while in possession of material non-public information concerning

the Company's financial condition and business prospects.

192.    The Insider Trading Defendants collectively reaped billions of dollars in profits selling their personal holdings of Company stock at prices ranging from $312 to $424 per share, substantially higher than the stock's closing price of $51.61 after the corrective disclosures on June 6, 2023.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

193.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other violations of law.

194.    Coinbase is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

195.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

196.    Plaintiff is an owner of Coinbase stock and has been a continuous holder of the Company's common shares at all relevant times.

197.    At the time this action was commenced, the ten-member Board was comprised of Defendants Armstrong, Ehrsam, Wilson, Andreessen, Kramer, Lütke, and Rajaram, along with Paul Clement, Chris Lehane, and Christa Davies, each of whom joined the Board in July 2024 and is not a party to this action. Accordingly, Plaintiff is only required to show that five directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below all, at least seven of the Board's current directors are incapable of making an independent and disinterested decision to institute and

vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

198.    The Individual Defendants, together and individually, violated and breached their fiduciary duties of candor, good faith, and loyalty. Specifically, the Individual Defendants knowingly approved and/or permitted the wrongs alleged herein and participated in efforts to conceal those wrongs. The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized, and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein. Accordingly, the Individual Defendants could not fairly and fully prosecute such a suit even if they instituted it.

199.    The Individual Defendants either knowingly or recklessly issued or caused the Company to issue the materially false and misleading statements alleged herein. The Individual Defendants knew of the falsity of the misleading statements at the time they were made. As a result of the foregoing, the Individual Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

200.    As members of the Board charged with overseeing the Company's affairs, each of the Individual Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Coinbase, the Individual Defendants knew, or should have known, the material facts surrounding the risk of customer asset loss in the event of bankruptcy, the Company's proprietary trading practices, and the unregistered securities on the Company's platform.

201.    Defendant Armstrong is not disinterested or independent and is therefore incapable of considering a demand. Defendant Armstrong has served as the Company's CEO since its inception in May 2012. Thus the Company admits that Defendant Armstrong is a non-independent director.

202.    Further, Defendants Armstrong and Ehrsam are not disinterested or independent because they co-founded the Company together. Accordingly, Defendants Armstrong and Ehrsam cannot be reasonably expected to consider with disinterestedness whether to sue fellow directors of a company that they founded and have helped to build from inception.

203.    Furthermore, Defendants Armstrong, Andreessen, Ehrsam, Kramer, Rajaram, and Wilson are not disinterested or independent because they are named as defendants, and face significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

204.    Defendants Wilson and Kramer serve as members of the Audit Committee and, pursuant to the Charter, were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls, legal and regulatory compliance, and public disclosure requirements. Throughout the Relevant Period, however, these Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding material deficiencies in the Company's accounting practices and the adequacy of the Company's internal controls as alleged above. Therefore, Defendants Wilson and Kramer cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihood.

205.    Additionally, each of the directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company. Indeed, all of the Individual Defendants benefitted directly from the wrongdoing alleged herein. Specifically, the Individual Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Coinbase stock and stock options they held.

206.    The Individual Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Individual Defendants to also adhere to Coinbase's standards of business conduct. The Individual Defendants violated the Code of Conduct because they knowingly or recklessly engaged in and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Individual Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

207.    Furthermore, demand in this case is excused because each of the directors derive substantial revenue from the Company, control the company, and are indebted to each other. These conflicts of interest have precluded the current directors from adequately monitoring the Company's operations and internal controls and calling into question the other Individual Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

208.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation

from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

209.    The acts complained of herein constitute violations of fiduciary duties owed by Coinbase's officers and directors, and these acts are incapable of ratification.

210.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Coinbase. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Individual Defendants were to sue themselves or certain officers of Coinbase, there would be no directors' and officers' insurance protection. Accordingly, the Individual Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Individual Defendants is futile and, therefore, excused.

211.    If there is no directors' and officers' liability insurance, then the Individual Defendants will not cause Coinbase to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as

well.

212.    Accordingly, for all of the reasons set forth above, at least seven of the Board's current members cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## COUNT I

### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)

213.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

214.    The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

215.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2022 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the Company's internal controls, risk management function, legal and regulatory compliance, and its customers' ability to safely invest in cryptocurrencies on the Company's platform.

216.    The 2022 Proxy was used to solicit shareholder votes in connection with the election of Defendants Ehrsam, Lütke, and Wilson to serve for another one-year term on the Company's Board. In addition, the 2022 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Armstrong, Choi, Haas, and Grewal. While the shareholder vote was non-binding, the 2022 Proxy indicated that the "Board of Directors and Compensation Committee . . . value the opinions expressed by stockholders in their vote on this proposal and will consider the outcome of the vote when making future compensation decisions

for our [] Executive Officers."

217.    With respect to the Company's "Compensation Policies and Practices," the 2022 Proxy indicates that compensation is performance-based, stating that "[a] significant portion of compensation is performance-based or variable and not guaranteed."

218.    The materially false and misleading statements contained in the 2022 Proxy regarding the Company's internal controls, risk management function, legal and regulatory compliance, and its customers' ability to safely invest in cryptocurrencies on the Company's platform therefore misleadingly induced shareholders to vote in favor of the election of Defendants Ehrsam, Lütke, and Wilson, and performance-based compensation to Defendants Armstrong, Choi, Haas, and Grewal, to which they were not entitled.

219.    The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

### Against the Individual Defendants for
### Breach of Fiduciary Duties

220.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

221.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

222.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

223.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their

fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

224.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, penalties arising from the SEC Complaint alleging that the Company listed unregistered securities in violation of the federal securities laws, which could amount to billions of dollars, damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

225.    Plaintiff, on behalf of Coinbase, has no adequate remedy at law.

## COUNT III

### Against the Insider Trading Defendants
### For Breach of Fiduciary Duties (*Brophy* Claim)

226.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

227.    During the Relevant Period, the Insider Trading Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the

Company's financial condition and future business prospects. Notwithstanding their duty to refrain from trading in Coinbase common stock under the circumstances, the Insider Trading Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

228.    The insider sales detailed herein, were not part of any regular pattern of sales for the Insider Trading Defendants and were suspicious in terms of timing and amount.

229.    The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Coinbase stock. At the time of their stock sales, the Insider Trading Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease. The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

230.    Plaintiff, on behalf of Coinbase, has no adequate remedy at law.

## COUNT IV

**Against the Individual Defendants for Aiding and
Abetting Breach of Fiduciary Duty**

231.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

232.    By encouraging and accomplishing the illegal and improper actions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties,

waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

233.    Plaintiff, on behalf of Coinbase, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for
### Unjust Enrichment

234.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

235.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Coinbase.

236.    The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Coinbase that was tied to their performance or to the artificially inflated valuation of Coinbase.

237.    The Insider Trading Defendants were further unjustly enriched with respect to insider sales of Company stock.

238.    Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

239.    As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

240.    Plaintiff, on behalf of Coinbase, has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants

**for Waste of Corporate Assets**

241.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

242.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Coinbase's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

243.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things, incurring and paying defense costs in connection with the Securities Class Action, and approving performance-based compensation linked to the Company's perceived successes.

244.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

245.    Plaintiff on behalf Coinbase has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their

unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock

sale proceeds, and imposing a constructive trust thereon;

      C.     Awarding punitive damages;

      D.     Awarding costs and disbursements of this action, including reasonable attorneys'

fees, accountants' and experts' fees, costs, and expenses; and

      E.     Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

    Plaintiff hereby demands a trial by jury.

 Dated: February 18, 2025

                      By: _/s/ Gina M. Serra_
                      **RIGRODSKY LAW, P.A.**
                      Gina M. Serra
                      Timothy J. MacFall
                      Samir Aougab
                      825 East Gate Boulevard, Suite 300
                      Garden City, NY 11530
                      Telephone: (516) 683.3516
                      Facsimile: (302) 654-7530
                      Email: gms@rl-legal.com
                      Email: tjm@rl-legal.com
                      Email: sa@rl-legal.com

                      *Attorneys for Plaintiff*